### MAURO GUSMAN v. THE STATE.

No. 2872.  Decided December 17, 1913.

**1.—Murder—Charge of Court—Murder in the Second Degree.**

Where, upon trial of murder, the court's charge on murder in the second degree was not subject to the criticisms made thereto by the defendant, and was a proper charge under the facts of the case, there was no error. Davidson, Judge, dissenting.

**2.—Same—Argument of Counsel—Reversible Error.**

Where, upon trial of murder, the district attorney, in his address to the jury, stated that he had learned that the defendant was a bad man and that he had committed a crime in Mexico, etc., for all of which there was no evidence, the same is reversible error.

**3.—Same—Leading Questions—Interpreter.**

Where, upon trial of murder, some of the State's witnesses were Mexicans and testified through an interpreter, leading and suggestive questions should not have been permitted.

Appeal from the District Court of Bell. Tried below before the Hon. John D. Robinson.

Appeal from a conviction of murder in the second degree; penalty, eighteen years imprisonment in the penitentiary.

The opinion states the case.

*W. K. Saunders,* for appellant.—On question of leading questions: Rangel v. State, 3 S. W. Rep., 789; Davis v. State, 43 Texas, 189;

Wright v. State, 10 Texas Crim. App., 476; Garrett v. State, 52 Crim. Texas Crim. Rep., 255, 106 S. W. Rep., 389.

On question of the court's charge on murder in the second degree: Pollard v. State, 73 S. W. Rep., 953; Beckham v. State, 69 S. W. Rep., 534; Holden v. State, 1 Texas Crim. App., 225; Priesmuth v. State, 1 id., 481; Davis v. State, 2 id., 588; Rice v. State, 3 id., 451; Surrell v. State, 29 id., 321; Miers v. State, 34 Texas Crim. Rep., 161; Black v. State, 38 id., 58; Johnson v. State, 42 id., 377.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, Judge.—Appellant was convicted of murder in the second degree, his punishment being assessed at eighteen years confinement in the penitentiary.

The evidence discloses that deceased and appellant had a fight on or beside the Santa Fe railroad track in the City of Temple at night somewhere in the neighborhood of 11 o'clock. There were two eye-witnesses, a Mexican woman and her daughter, named Acquilla. The girl states that on the night in question she was standing on the gallery and her mother was standing in the door of their residence, which was about sixty feet distant from where the fight occurred; that it was a dark night, between 10 and 11 o'clock. She recognized the defendant as one who was talking to the other man. When they were about in front of the residence they began fighting. She called her mother's attention to the fact that the defendant was hitting the other man but did not know what with, but they were fighting; that defendant threw the other man down and went to beating him. He fought him until he got him down. Before the train got there appellant wanted to put the deceased on the track, so she says, that the train might run over him, and deceased asked appellant not to put him on the track, but let him die easy. There was no light there but the train light that was coming north was close enough to throw light on the men, according to her version. She heard deceased ask for his money, and say, "Give me my money." Appellant went off and left him. She said: "I heard some people coming down the track, this man (defendant) and the other man were talking along the track, and when they got in front of the house then they started to fighting, and he (defendant) knocked him (Zabola) down and left him lying there on the track. This fellow (defendant) told him (Zabola) that he left him there forever and ever, and Zabola told him not to put him on the railroad track, but please leave him there, not to molest him, he was killed and nearly dead, and let him die easy, and not to put him on the track; and he told him to leave his money there, but he took his money and pulled right away. And when he saw this light coming in front of our house this fellow ran off right away. This man (defendant) did not say anything to Zabola when he asked him not to take his money, but just left. He took right down the fence going north, walking very fast. I saw them both

fighting, but did not see whether Zabola hit this man or not. I did not see what the defendant hit the deceased with, but I saw the defendant have the deceased down on the railroad when he first throwed him down and got on him and beat him. In the beginning of the fight the defendant took hold of the deceased and threw him down. Had him by the shoulders, pulling him down backward, and he was behind him when he got him by the shoulders, in the beginning of the fight. He pulled him down like that and hit him against the rail, and just kept on beating him. I saw him beating him, but I do not know what with. No, sir, I did not see him stamping him with his feet; all I saw was him on top of the other man and beating him, but did not know what he was beating him with. That was a bright light in that vicinity, right in front of the train that was coming, but I don't know whether it was an electric headlight or not; it was a bright light. Just my mother and I were there at the time. My mother was right at the door, and I was a little to the side of the gallery. I was closer to the defendant and the deceased at the time the fight was going on than my mother was." The evidence further discloses that near the body of the deceased was found an open pocket-book or what the witnesses call a folding pocket-book, but no money in it. There is evidence going to show that deceased had nine dollars. This was not found on his person. There is also some evidence to the effect that deceased's feet were against one of the rails of the track and his head was against another one, and it would seem from the description of this condition of things there was an interval there between two railroad tracks, and that deceased's head was against one and his feet against the other. That is left, however, in considerable confusion, but as best we can know from this record that was the attitude of the body of deceased when found. Deceased had a couple of bruises on his head, and a considerable wound, a contused wound, on the side, and two or three of his ribs were broken. He died the following night. In the evening before his death—about five or six o'clock in the evening—he made a statement to the effect that appellant was the man who inflicted the wounds upon him. In order that no misconception may be had with reference to the body of the assaulted man, this is copied from the testimony of the witness, Tom Acquilla, father of the girl who had previously testified: "I saw the deceased, but did not have a conversation with him. When I first saw him he was laying just like that chair was the double of the track and he had his foot against the rails, right jam up to the rails but not over them, and his head this way, and his head from the other rail about that much, and his feet up jam to this rail." He declined to tell the witness who had inflicted the injuries upon him but told him he would tell him tomorrow. He seems not to have ascertained anything further from the deceased. The doctor who examined the deceased, testified, "he had injuries to his scalp, face and chest, and several broken ribs. There was a lacerated wound on the scalp about this position and a small one over the left eye, and

several ribs were broken, it was impossible to tell how many. His skull was not broken, but there were some small bruises on the left side of his head, and some small bruises on the back of his head." A witness named Pegora testified he had a conversation with the deceased about 7 o'clock in the morning in which he told witness that he was going to die; he did not tell him how the difficulty originated; he said that Mauro Gusman was the man who killed him. "He did not tell me how Gusman beat him up or anything like that; he told me the two scars here was where he bit him with his teeth. I could hardly make out much he said. It was between ten and eleven o'clock Saturday night that he died." This is a sufficient statement of the case. Defendant fled and was arrested in New Mexico.

The indictment charged appellant killed the deceased by "unlawfully striking, beating, wounding and bruising the said E. Zabola with his hands and feet and with some instrument the nature and description of which is to the grand jurors unknown, and with an instrument of hard substance, a better description of which is to the grand jurors unknown, and by stamping him, the said E. Zabola, with his feet and by shoving, throwing, casting and bumping the body of said E. Zabola against the cross ties and rails of a railway track and against the earth and ground, against the peace and dignity of the State."

The court charged the jury in this connection: "If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use in a sudden transport of passion, aroused without adequate cause, and not in defense of himself against an unlawful attack, reasonably producing a rational fear or expectation of death or serious bodily injury, with the intent to kill, did unlawfully beat, bruise, wound and strike and thereby kill E. Zabola as charged in the indictment, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, provided it be for not less than five years."

Several objections were urged to this charge, among others, that it authorized the jury to convict appellant if he killed deceased with a deadly weapon or instrument reasonably calculated or likely to produce death. Objection is also urged to that portion of the charge which authorized a conviction if the defendant killed the deceased in a sudden transport of passion aroused without adequate cause and not in defense of himself against an unlawful attack reasonably producing a rational fear or expectation of death or serious bodily injury. Upon another trial the court should submit the issues to the jury as set out in the indictment. There was no allegation in the indictment that deceased was killed with a deadly weapon. While this might not be a serious matter and for which the judgment ought to be reversed, about that we express no opinion, but upon another trial the court should submit the allegations contained in the indictment. A deadly weapon or instrument reason-

ably calculated, etc., is not set out in the indictment, unless it be in-
ferred from the general allegations "some means unknown to the grand
jurors," or unless it be held that the allegation which says he beat him
against the railroad track and ties, to meet this phase of the charge.
We do not believe so. However, under the other phase of the charge,
under all of our decisions, this charge is fatally defective. It would
not be murder in the second degree, as stated by the court, if appellant
killed in a sudden transport of passion aroused without adequate cause
and not in defense of himself. Murder in the second degree is a killing
upon implied malice; it is a killing with express malice eliminated, and
without manslaughter, self-defense or other extenuating circumstances,
on the other. The jury was not informed of what is meant by "sudden
transport of passion aroused without adequate cause." And manslaughter
is nowhere in the charge given; no instruction upon the law of man-
slaughter was embodied in the charge, nor was any definition given of
what it took to constitute adequate cause. See Pollard v. State, 45 Texas
Crim. Rep., 121; Whitaker v. State, 12 Texas Crim. App., 436; Beck-
ham v. State, 69 S. W. Rep., 534.

In this connection, that part of the charge is urged as error which
says that "implied malice is that which the law infers from or imputes
to certain acts, however suddenly done; thus, when the fact of an un-
lawful killing is established, and the facts do not establish express
malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify
the act, then the law implies malice, and the murder is in the second
degree." This charge standing alone without some explanation as to
what is meant by mitigation, extenuation or justification is not sufficient.
While the court's charge may be sufficient upon the definition of self-
defense, it nowhere undertakes to instruct the jury as to any other
inferior degree of the difficulty such as manslaughter or negligent homi-
cide or any of those matters that would mitigate. It seems, under prac-
tically all the authorities, this is error. One of the latest cases upon
this is Roberts v. State, 70 Texas Crim. Rep., 588, 156 S. W. Rep., 651;
see Holden v. State, 1 Texas Crim. App., 225; Priesmuth v. State, 1
Texas Crim. App., 481; Kouns v. State, 3 Texas Crim. App., 13. This
seems to be practically the unbroken line of authorities. The court
should have gone further and explained these matters to the jury. Tak-
ing the two charges criticised, and to which objection is urged, the law
of the case was not submitted to the jury as required by the statute and
the decisions as applicable to a state of facts where a conviction for
murder in the second degree is sought.

In this connection, while it is not urged, in view of another trial, we
would suggest that manslaughter be submitted to the jury if the facts
upon another trial are as contained in this record; and we are further
of opinion that the issue of aggravated assault should have been given.
No witness swears to any instrument used by the defendant, and the
evidence fails utterly to disclose the finding of any instrument, or any
fact outside of the wounds, that an instrument was used. It is true

that the wounds upon the body indicate that there were broken ribs, which would tend to show violence out of the ordinary was used, and under our statute if there is an issue which shows an ordinary fight and without intent to kill, the party might be guilty of any degree of assault usually where the assaulted party died. It is left entirely to inference as to how the deceased was killed, or with what, if any, instrument. Deceased was lying beside of the railroad track, and almost immediately after the defendant left the deceased a heavy engine passed by where the body of the deceased was near the track. As to whether this engine struck the body of the deceased and broke the ribs is not shown, except it be from the dying statement of the deceased to the effect that defendant killed him. However, there is no evidence before the court as to what sort of instrument appellant used, no witness undertaking to swear there was any bludgeon or instrument of any sort used. So, taking it altogether, we are of opinion the charge on manslaughter and aggravated assault should have been given, and we mention this so if the facts on another trial are as upon this trial these issues should be submitted to the jury.

There is a bill of exceptions of some length reserved to the manner of examining the Mexican witnesses for the State. The questions are clearly and pointedly leading and suggestive. The court said he permitted this because they were Mexicans and did not seem to understand very well, speaking through an interpreter. Even from that view of it, we think the questions are entirely too leading and suggestive. As illustrative: "Q. Ask her to state to the jury, what, if anything, she heard the dead Mexican or Zabola say to him (defendant) about not taking his money. A. She said she heard this dead man ask him for his money, said give me my money, said he went off and left him. Q. Ask her to state to the jury if she heard the defendant say anything about this would be his last day? A. Told him that was his last day." There are two or three pages of these questions and answers. We are of opinion that even if they were Mexicans and had to speak through an interpreter, these questions went a little too far. The witnesses seemed to have been intelligent, and there is an affidavit connected with the motion for new trial which indicates one of them could speak the English language well, but in any event it could have been asked her to state what was said by the parties at the time of the difficulty, and if she then could not recollect or seemed to want sufficient intelligence to understand, a more direct question could have been asked. We believe under this bill of exceptions the questions were just a little too suggestive and leading. Upon another trial these matters should be avoided.

Three bills of exception are found in the record which recite that the district attorney in his closing argument said: "Since the trial of this case I have learned that this defendant is a bad hombre; that Mexico is about the last place he would want to go as he has committed a crime over there and had to leave that country on account of it, and they would like to get hold of him for it." Numerous objections were urged to this

manner of argument. The court signs the bill by stating that, "the evidence showed that some time after the homicide the defendant was arrested in New Mexico, and the district attorney in opening the State's case had alluded to the fact that the defendant had fled soon after the crime was committed. The defendant's attorney in answer thereto stated that it was probable that defendant was not fleeing from any crime, but was going to his home in Old Mexico. To this the district attorney in concluding the case said that from the circumstances surrounding this killing we have a right to infer that the defendant had probably fled from crime committed by him in his own home, as he had fled from this crime, and that he was not going in the direction of his home." The court's attention was called to the argument of the district attorney by defendant's counsel, and the court inquired of the district attorney what the statement was. The district attorney repeated the statement, to which the defendant excepted, and the district attorney stated that the argument was proper and again repeated the same words. Defendant's attorney requested the court to stop the district attorney from repeating the statement, but under the circumstances it appeared to the court to be a proper argument and deduction from the evidence and argument.

Another bill recites that for the second time the district attorney said: "Well, gentlemen, I repeat that since the trial of this case I have learned that this defendant is a bad hombre; that Mexico is about the last place he would want to go to as he has committed a crime over there and had to leave that country on account of it, and they would like to get hold of him for it." The same objections and same procedure was gone through, and the court qualifies this bill by referring to his qualification of the previous bill.

Another bill recites that for the third time the district attorney said: "Well, gentlemen, I again repeat that since the trial of this case I have learned that this defendent is a bad hombre; that Mexico is about the last place he would want to go to, as he has committed a crime over there and had to leave that country on account of it, and they would like to get hold of him for it." The same objections were made and the same qualification as in the previous bills, at least, the court signs the last two bills as he did the first bill.

These speeches and remarks were not justified by anything in this record. There was no evidence to the effect that the defendant fled from Mexico to this country for crime, or that he committed any crime in Mexico. There is no evidence in this record that he was a bad man in Mexico or a bad man anywhere, unless whatever deduction might be had from the facts of the case in connection with this trouble. As to what his previous record or standing was there is no testimony. He had not placed in evidence his reputation or character from any standpoint. There were two matters emphasized three times by the district attorney that are not justified: first, that he was a bad man, and, second, that he had fled from Mexico on account of crime in that country and for

which those people over there wanted him. We have had occasion several times recently to call attention to such speeches outside the record,, and about which there was no testimony. This should be avoided. They call for reversals. The prosecution should keep within the record.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

PRENDERGAST, Presiding Judge, HARPER, Judge.—We agree to the reversal of this case on account of the matters presented in regard to the action of the district attorney in stating to the jury "that he had learned this defendant is a bad hombre; that he had committed a crime in Mexico," etc., there being no evidence as to these matters in the record.

We do not think the charge on murder in the second degree is subject to the criticism herein contained, and for our views we refer to Hicks v. State, this day decided. Nor is any other error presented by the record when it is read as a whole.