BENNIE BLOCKER v. THE STATE.

No. 12442. Delivered April 10, 1929.

276

The opinion states the case.

*W. V. Dunham* and *W. H. Forrester* of Waco, for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

MARTIN, JUDGE.—The offense is murder; the penalty, thirty-six years.

The appellant was a negro tenant farmer; the deceased a white man. Both he and deceased lived near the little village of Bosqueville. They met at a store in the last named place on the day of the fatal difficulty. They were friends of many years standing and no trouble had theretofore occurred between them. Witnesses at the trouble agree in most part upon the essential facts of the killing, there being some difference however as illustrated in what follows. The owner of the store, Mr. Harrell, testified that during a friendly conversation between the two, appellant referred to his neighbor as "Mr. John Weaver." John Weaver appears to have been a negro some fifty or sixty years old. The deceased objected to appellant referring to a negro as "Mister," to which appellant replied, according to Mr. Harrell: "I have always called older men 'Mister' all my life, and I figure that's my own business to say whatever I want to, and Mr. Williams said: 'Why, Bennie, you don't mean to sass

me, do you? I will slap your jaws.' " Whereupon deceased slapped him with his open hand, and during an ensuing difficulty deceased was cut from the effects of which he later died. Mr. Harrell's son also present at the difficulty testified to substantially the same facts, except he says appellant replied to Mr. Williams: "I don't see why you should care what I call a negro; I have been used to calling him 'Mister' all my life, and Mr. Williams said: 'You know how much I care? I will break your neck.' I think he did use a damn in it, but I will not be sure, I think he said: 'You know how much I care, Bennie? I will break your damn neck.' * * * When he said that, he advanced on Bennie and struck him on the right side of the face. * * * After Bennie was struck, he pulled a knife out of his right pocket and struck Mr. Williams in the side with the blade of the knife. Mr. Williams turned and ran out of the store door and Bennie was following him, cutting him with the knife." There was also testimony from both of these witnesses that the elder Harrell grabbed an axe handle and the younger Harrell a shot gun, which he handed to Williams and Williams snapped it at appellant as he rode away on a horse. According to these witnesses, the axe handle and gun were not procured until Williams had emerged from the house and had practically gotten out of appellant's way. According to appellant, they got them immediately, which frightened him, and he continued to cut Mr. Williams to escape from the three, he testifying that Williams was between him and the door and that he had to cut his way out. Appellant was shown to have always borne a good reputation.

Some of the jury were shown to have voted originally for the death penalty and the verdict of thirty-six years was a compromise verdict.

This brief statement of the substance of the incriminating facts is, we think, sufficient to illustrate the point discussed herein.

During the closing argument of the County Attorney to the jury he made the following statement: "This negro who had two other cutting scrapes, wanted to cut some more." This was objected to as having no support in the record and a special charge requested to disregard same, which was refused by the Court with the explanation that appellant's confession introduced in evidence showed that he had had two other cutting scrapes, which part of the confession referred to is shown in the bill and is as follows: "I have been cut twice, but this is the first time I ever cut anyone. I was cut on the left arm and on the left hand by two different fellows." The

bill shows affirmatively that the appellant had not had a cutting scrape before, that he had not cut anyone before, but on the contrary had himself gotten cut but under what circumstances is not shown. Enough has been quoted to show that the issue of guilt was closely contested and we think that the statement of the County Attorney, which affirmatively appears to have been entirely without basis in the testimony, was prejudicial error. The rule is stated by Mr. Branch as follows:

"If State's counsel desires to testify during the argument he ought to ask to be sworn. The unsworn statement of State's counsel to the jury of a material fact adverse to defendant which was not put in evidence during the trial will require the judgment of conviction to be set aside." Hunnicutt v. State, 18 Tex. Crim. App. 523; Gusman v. State, 171 S. W. 770; Branch's P. C., Sec. 364.

In appellant's Bill of Exception No. 38 it is made to appear that private prosecutor in addressing the jury made use of the following language:

"Williams in slapping the defendant, was an effort on his part to keep this negro in his place, and Southern Gentlemen will not condemn him for it."

Appellant asked a special instruction to disregard this, which was given. The Court certified in this bill as follows:

"The undisputed evidence being that the slapping of defendant by deceased was an unprovoked assault."

It appears in another bill that the same private prosecutor stated to the jury in his argument:

"I have lived in this county all my life and I do not have to tell twelve southern men what to do in the case."

It is correctly contended, we think, that these remarks constituted a veiled and covert appeal to race prejudice. It seems plainly intended as an appeal to convict because a negro had killed a white man and this regardless of his legal rights. The Fourteenth Amendment to the United States Constitution provides that "no State shall deny to any person within its jurisdiction the equal protection of the law." If this provision of our organic law is not to become a vain and empty phrase, then an appeal to convict a citizen of Texas because his skin is black is highly improper and the approval of a conviction obtained in whole or in part by virtue of or which has been influenced by such an argument is in effect a denial of equal protection of the law to citizens of Texas. Neal v. State, 50 Tex. Crim. Rep. 583; Taylor v. State, 50 Tex. Crim. Rep. 560; Lester v. State, 2 Tex. Crim. App. 432.

As stated by Judge Hurt in Thompson v. State, 33 Tex. Crim. Rep. 475:

"It is not to the interest of the State to secure the conviction of the accused, though they be guilty, by any method except that which is in accord with the due and proper course of the law of the land. While the law should be enforced strictly, we understand that the enforcement of the law means to give to the State all that which belongs to her, and to the accused that which belong to him; and if convicted and the evidence supports the verdict, the law will be enforced. There is law for the State and law for the accused both, and the law will be enforced properly. Deny to the accused his legal rights, and the law (though he be guilty) will not be enforced."

If there is in American jurisprudence a distinguishing quality that sets it apart from all the others of the earth and which gives to it a secure and towering place in the history of the upward struggle of the human race, it is that which makes the law the majestic sovereign of all alike, before whom the humble and the mighty without regard to color or creed or station in life must receive equal protection— "one law and one Lord over all." Whatever the justly revered traditions of the old South may be, the accused cannot be tried according to these, but only according to law.

The judgment is reversed and cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.